ATWOOD *against* WELTON.

A witness, on his cross-examination, may be enquired of, whether he has not had a controversy with the party against whom he testifies, and whether he has not threatened to be revenged on him, for the purpose of discrediting his testimony ; and if his answer is in the negative, it may be contradicted by other witnesses.

A person who disbelieves in any punishment in a future state, though he believes in the existence of the Supreme Being, and that men are punished in this life for their sins, is not a competent witness.

THIS was an action *qui tam,* for taking usury, brought on the statute, to recover the value of the money alleged to have been loaned by the defendant, to one *Hezekiah Scott,* on a corrupt and usurious agreement.

The cause was tried, on the general issue, at *Litchfield, February* term, 1828, before *Peters, J.*

On the trial, *Hezekiah Scott,* named in the declaration as the borrower of the money, was offered as a witness by the plaintiff, to prove the alleged usury. An objection was made to his testimony, on the ground that he was not a believer in divine revelation. This objection was overruled. It was then

objected, that he did not believe in the existence of a Supreme Being, nor in future rewards and punishments, nor in a future state; and to these points several witnesses were examined, by whom it was proved, that "said *Scott* professed to believe in the doctrine of the *Universalists*, and in the existence of the Supreme Being; that men were punished, in this life, for their sins, but would all be made happy, immediately after death, by their Creator." The judge admitted the witness, this objection notwithstanding. Upon his cross-examination, he was asked, by the defendant's counsel, whether he had not been in a controversy with the defendant, and whether he had not threatened, that he would be revenged on him for collecting of him the note mentioned in the plaintiff's declaration; to each of which enquiries, *Scott,* the witness, answered in the negative. And thereupon the defendant offered *Richard Bryan* and others, as witnesses, to prove, that *Scott* had been in a controversy with the defendant, and had threatened, that he would be revenged on him for collecting said note. These witnesses were objected to, by the plaintiff; and the judge rejected them. The counsel for the defendant then requested the judge to instruct the jury, that the facts proved respecting the opinions and belief of *Scott* ought to discredit him as a witness. The judge refused to give the instructions requested, but instructed the jury, that the credibility of the witness depended on his character; of which they, the jury, were the proper judges. The plaintiff obtained a verdict; and the defendant moved for a new trial, on the ground that these decisions of the judge were erroneous.

*Bacon* and *O. S. Seymour,* in support of the motion, contended, 1. That one who disbelieves in a future state of rewards and punishments, is not a competent witness. *Scott,* the witness in this case, believed in neither. He believed, that he received reward and punishment *in this life,* but that immediately after death, he should be happy, whatever his conduct might be here. His faith was as inoperative upon his conduct, as if he did not believe in any future state at all. Such a person, according to nearly all the authorities, is an incompetent witness. *Omychund* v. *Barker,* 1 *Atk.* 45. *The King* v. *Taylor, Peake's Rep.* 11. *Strong* v. *Curtiss,* 4 *Day* 51. *Jackson* d. *Tuttle* v. *Gridley,* 18 *Johns. Rep.* 98. 106. 1 *Phill. Ev.* 18. *Swift's Ev.* 48. 1 *Swift's Dig.* 739.

Litchfield,    2. That if the witness were competent, his disbelief of fu-
June, 1828.  ture punishment ought to go to his credit.    1 *Atk*. 45.    *Huns-*
Atwood    *com* v. *Hunscom,* 15 *Mass. Rep*  184.
v.
Welton.    3. That after having asked *Scott* whether he had not had a
controversy with the defendant, and had threatened revenge,
and after *Scott's* answer in the negative, the defendant had a
right to enquire concerning these facts from other witnesses.
For, in the first place, testimony to these facts was proper and
relevant, and such as the defendant had a right to produce, in
some shape or another.   Though you cannot, for the purpose
of impeaching the general character of a witness, shew par-
ticular facts affecting that general character; yet you may
shew a *bias,* either of partiality or prejudice, of the witness, in
a particular case, which renders him unworthy of credit, by
the proof of particular facts and declarations.   In this way,
and for this purpose, it is the daily practice, to shew, that the
witness has an interest in the question; that he is related to
the party in whose favour he testifies; that he has had a
quarrel with the party against whom he testifies; that he
has been active in the preparation of the cause, &c.   Wherev-
er the testimony fairly conduces to prove such bias, the enquiry
is proper.   Secondly, the defendant's having put this question
to the witness and obtained his answer in the negative, did not
preclude enquiry of other witnesses.   There are cases where
the answer of the witness on cross-examination, is conclusive
on the party putting the question; but the rule on this subject
is confined to *irrelevant* questions—*i. e.* to such questions as
might have been objected to as irrelevant.   *Spenceley* q. t. v.
*De Willott,* 7 *East* 108   *Yewin's* case, cited 2 *Campb.* 638.
1 *Stark. Ev.* 135.   3 *Stark. Ev.* 1755.   This question being
relevant and material, why may not the truth be shewn?   Why
is *Scott's* answer conclusive?   He who attempts to shackle the
enquiry, should shew some good reason for it   It may be said,
that to allow this enquiry, would be to multiply issues, and
confound the jury.   But if the testimony is relevant, this can
be no objection.   Besides, it will be conceded, that we might
have put this question to other witnesses, had we not asked
*Scott.*   How then, are the issues multiplied?

*Benedict* and *J. W. Huntington,* contra, contended, 1. That
the witness ought not to have been excluded as incompetent,
for want of religious belief.   In the first place, it is perfectly

consistent with every fact stated in the motion, that the witness <span style="float:right">*Litchfield.*</span>
believed in a *limited* punishment in a future state.    He was an <span style="float:right">June, 1828.</span>
*Universalist* : he believed in the existence of the Supreme Be-
ing ; that men are punished here for their sins ; and that
hereafter they will be happy.    How much more he believed,
does not appear.    The objector takes on him the burden of
proof.    All that the witness did believe, is consistent with a
limited future punishment.

Atwood
*v.*
Welton.

Secondly, if he disbelieved in any future punishment, it
would not exclude him.    The test is, belief in the obligation of
an oath.    This implies belief in the existence and providence
of God.    If the witness believes there is a God, who will
punish the false witness, it is enough : whether the punish-
ment is to be inflicted in this world or the next, is not material.
Such a person has a tie on his conscience ; and acts under a
religious sanction.    The extent of the sanction is never the
subject of enquiry, for the obvious reason, that human legisla-
tures and human judges can never determine the extent of it.
Hence, *Gentoos*, and *Pagans* generally, *Mahometans* and *Jews*,
whose ideas of a future state are known to be very indistinct
and loose, are admitted as witnesses, without investigating their
particular views.    *Willes' Rep.* 549. 550, 1.    1 *Atk.* 40, 1, 2.
44.    *Morgan's* case, *Leach's Cro. L.* 58. (*Dub.* ed.)    *The
People* v. *Matteson,* 2 *Cowen* 433.    *The Queen's* case, 2 *Brod.
& Bing.* 284.

The *Universalists* are *Christians.*    They believe in and
worship, not only God, but the Saviour.    They believe in an
atonement ; not indeed a limited, but an universal one.    In
what way *Scott* believed his salvation would be brought about,
does not appear.    He might have believed, with many pious
*Christians,* that he was among the *elect,* and that he should be
saved through the sanctification of the *Spirit* and the truth,
without the deeds of the law.    If this was not *Scott's* belief, it
is the belief of many conscientious men, and the same principle
that excludes him, will exclude them.    They believe, that they
shall certainly be happy immediately after death.    Is the Court
prepared to say, that such men are incompetent witnesses ?

2. That if the opinions of *Scott* did not render him incompe-
tent as a witness, they ought not to affect his credit.    The law
never permits an enquiry into the peculiar faith of a competent
witness for the purpose of affecting his credit.    To allow this
to be done, would be to open a door for the influence of secta-

rian prejudices or partialities, most unfavourable to the administration of justice.

3. That the defendant could not disprove the answer of the witness, that he had not had a controversy with the defendant, and had not threatened to be revenged on him. It is well settled, that you cannot contradict a witness with respect to matters *purely collateral.* 1 *Stark. Ev.* 145, 6. 134. *Rex* v. *Watson,* 2 *Stark. Rep.* 149. *Harris* v. *Tippett,* 2 *Campb.* 637. The next question is, what is meant by being collateral? The answer is, " irrelevant to the issue on the record ;"— *i. e.* any acts or declarations of the witness, not relating directly to the issue on the record, or to the suit in which he is called as a witness. 1 *Stark Ev.* 134. 141. 2 *Campb.* 638. It is obvious, that the former controversy of *Scott* with the defendant and his threats of revenge, had no relevancy to the question of *usury* put in issue in this case.

The rule, by which the judge was governed, on the trial, is well settled, and is in perfect analogy to another of constant application in practice, in respect to the manner of proving the interest of a witness ; which may be done, by calling on the witness himself, or by proving his interest, by other witnesses ; but both methods cannot be resorted to. *Swift's Ev.* 109. *Butler* v. *Butler,* 3 *Day* 214. *Mallet* v. *Mallet,* 1 *Root* 501. *Coit* & ux v. *Bishop,* 2 *Root* 222. *Stebbins* v. *Sackett,* 5 *Conn. Rep.* 258. *Chance* v. *Hine,* 6 *Conn. Rep.* 231.

The practice in this state, has been, to invalidate the testimony of the witness, by proving that he has, on other occasions, given a different account of the subject matter of his evidence, without first calling upon him ; but if the enquiry be first made of him for that purpose, his answer is to be taken as conclusive.

DAGGETT, J. It is very clear, that a witness, on his cross-examination, may be questioned as to his being in a controversy with the party against whom he testifies, and whether he has not threatened to be revenged on him. If he should answer affirmatively, it would show a bias on his mind, which ought to be weighed by the jury, in considering his testimony. To such a witness as full belief will not be readily yielded as to one who feels no such hostility. If the witness should answer in the negative, it is equally clear, he may be contradicted by other proof. A witness may always be asked any question relative to the issue, for the purpose of contradicting him, if his

answer be one way, by other witnesses, in order to discredit *Litchfield,*
his whole testimony    " *Falsus in uno, falsus in omnibus*," has June, 1828.
become a familiar maxim.   Such has been the invariable rule   Atwood
in our country ; and such is the rule of the common law.   In   *v.*
upwards of forty years practice, I have not known it to be   Welton.
doubted.   It is true, a witness may not be interrogated as to
any *collateral* independent fact.   This would be to try as many
issues as a party might choose to introduce, and which the
other party might not be prepared to meet.  *Spencely* qui
tam, v. *De Willott,* 7 *East* 108.   The question whether the
defendant had a controversy with the witness, and had threat-
ened to be revenged, surely was relevant to the issue ; for it
tended to prove such a state of mind towards the defendant,
as might well be submitted to the jury to discredit his testimo-
ny as to material facts.   There is hardly a point about which
there can be less doubt.  *Swift's Ev.* 148.  16 *Mass. Rep.*
185.  17 *Mass. Rep.* 160   2 *Camp. Rep.* 630.  1 *Stark. Ev.*
135.  " In such a case, (says the learned Commentator,) the
enquiry is not collateral, but most important to show the mo-
tives and temper of the witness in the particular transaction."

It is also insisted, by the defendant, that the court should
have told the jury, that the proof of the witness' unbelief in a
future state of rewards and punishments, might impeach his
testimony ; for that a person of this religious opinion might not
feel the same obligation to speak the truth as if he believed in
the denunciations against " perjured persons "   This point
might deserve much attention, were it necessary to decide it ;
for such is the decision in *Hunscom* v. *Hunscom,* 15 *Mass. Rep.*
184. so far as the brief report of that case may be considered
as bearing on this case :—so too are the decisions cited from
2 *Cowen* 432. 572.  But in the view which I take of the con-
dition of this witness, he should not have been admitted.  This
supersedes the necessity of an enquiry as to the credit, to which
his testimony was entitled

The question is not, whether a person who believes in *any*
future punishment, though not endless, may be admitted as a
witness ;—but, whether a person who denies *all* punishment
after this life, and who, in the language of the motion, believes
that men will be punished in this life for their sins, but immedi-
ately after their death, be made happy, be a competent witness.

Nor is it necessary to ask or to answer, whether an oath shall
be refused to any one, on the ground of his religious opinions.

No objection is or can be made, in many such cases; nor are the rights of any individual particularly affected. Of this description are the oaths administered to electors under our constitution, oaths to support that constitution and the constitution of the *United States,* and oaths taken by judges, magistrates, &c. of all grades. But the question is, if a person denying all future accountability, is offered as a witness in a court of justice, in a case where life, liberty, property or reputation are to be affected, by his testimony, he may not be objected to, by the party against whom he is about to testify ; and whether, in such case, he is a competent witness ?

Nor has the statute in this state relative to the people called *Quakers,* who decline to take the oath by reason of scruples of conscience, and for whom a substitute is provided, by affirmation, under the pains and penalties of perjury, any bearing on this question. This is a legislative enactment in alteration of the common law, which courts are bound to obey, and without which enactment, they could not dispense with the common law oath. Besides, the pains and penalties of perjury comprised in the oath, are not limited to the statute punishment, but extend, it is believed, to the future punishment denounced against false witnesses. It is doubted whether the legislature would consent to amend that oath, by adding this qualification next after the words "pains and penalties of perjury"—"*to be inflicted in this life only.*"

It is also true, that no declaration can be received in a court of justice without oath. The casuistical position, that an oath does not increase the obligation to speak the truth, is not yet a maxim of the common law. A man of the most exalted virtue, though judges and jurors might place the most entire confidence in his declarations, cannot be heard in a court of justice, without oath. This is a universal rule of the common law, sanctioned by the wisdom of ages, and obligatory upon every court of justice, whose proceedings are according to the course of the common law. One credible *witness* is required to establish any fact. 3 *Bla. Com.* 370.

" Where," said the greatest and best of men, " is the security for property, for reputation, for life, if the sense of *religious obligation* desert the oaths, which are the instruments of investigation in courts of justice ? And let us with caution indulge the supposition that morality can be maintained without religion." *Wash. Farewell Address.*

Let us now examine the oath, which a witness must take, before he can be heard in a court of justice. This oath is an appeal to God, by the witness, for the truth of what he declares, and an imprecation of divine vengeance upon him, if his testimony shall be false. All law writers agree substantially in this definition, from the earliest to the latest. 1 *Phil. Ev.* 18. and cases there cited. The witness must believe in the existence of God ; for it would be absurd to hear an appeal made to a being whose existence is denied. I am not aware of any doubt on this point. Many of the ablest commentators carry the principle much farther. Thus, Lord *Coke* says, generally, that an *infidel* cannot be a witness ; (4 *Co. Rep.* 6. *b.*) and under this he included *Jews*, as well as heathen. 2 *Inst.* 506. 3 *Inst.* 165. Mr. Sergeant *Hawkins* thought it a sufficient objection to a witness, that he believed neither the old nor the new testament. *Hawk. Pl. C. b.* 2.—*c.* 48. *sect.* 148. Lord *Hale* denied this rigid rule ; (2 *Hal. Pl. C.* 279.) and it is now exploded.

The doctrine, as now established, in this country and in *England*, is, that if a person believes in a God, the avenger of falsehood, and in a future state of rewards and punishments, he may be a witness, and not otherwise. In the case of *The King* v. *Taylor, Peake's Rep.* 11. a witness was called for the prosecution. The counsel for the defendant asked him, if he believed in *Jesus Christ.* This question was objected to ; and *Buller*, J. overruled it, saying, it should not be put. He was then asked, if he believed in the holy gospels of God. *Buller*, J. said, that was not the proper question ; and asked him, if he believed in God, the obligation of an oath, *and a future state of rewards and punishments ;* and on his answering in the affirmative, he was admitted.

I am aware, that this question may not now be put to a witness, but the course is to enquire of other witnesses as to his belief on those points, and to decide the question of admissibility on such proof. This is manifestly proper ; because a man ought not to be questioned respecting his religious opinions, as the enquiry may subject him to reproach, if he should confess his infidelity ; and moreover, it would seem absurd to enquire of him *under oath*, whether he does not entertain such opinions as would show that he was unfit to be sworn. If, on enquiry of witnesses, it is satisfactorily proved, that the person does not believe in a future state of *rewards* and *punishments,* there

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

Litchfield, is not that tie upon his conscience, and of course, that sanction, June, 1828. which the law requires; and therefore, he ought not to be

Atwood  
v.  
Welton.

sworn.

This is the rule of the common law; and there is no adjudged case, nor hardly a *dictum* in the *English* books, against it. In *Jackson* d *Tuttle* v. *Gridley*, 18 *Johns. Rep.* 98. *Curtiss* v. *Strong*, 4 *Day* 51. *Swift's Ev.* 48. 1 *Swift's Dig.* 739. this doctrine is laid down, and the reasoning is very satisfactory. In 3 *Bla. Com.* 389. the editor, Mr. *Christian*, remarks in a note, that he has known a witness rejected and hissed out of court, who said, that he doubted the existence of a God and a future state. Mr Justice *Story*, in a case which occurred before him and the District Judge in *Rhode-Island*, in *November*, 1827, gave the following opinion: " We think these persons are not competent witnesses. Persons who do not believe in the existence of God, or a *future state*, or who have no religious belief, are not to be sworn as witnesses. The administration of an oath supposes, that a moral and religious accountability is felt to a Supreme Being; and this is the sanction which the law requires upon the conscience, before it admits him to testify." One of those witnesses did not believe in the existence of a God;—the other did not believe in a state of future rewards and punishments here or hereafter,—indeed did not seem to have any settled religious belief. Both were rejected. The opinion of this learned judge expressly excludes a witness, who denies the existence of God, who denies a future state, or has no religious belief. Can it be seriously contended, that a person who believes he shall be made immediately happy after death, without any regard to his conduct in this life, would feel any stronger obligation to speak the truth, than one who disbelieves in a future state ?

But the decision in *Connecticut, Curtiss* v. *Strong*, 4 *Day* 51. must be the guide to this Court. That case was elaborately discussed;—it was decided by the unanimous opinion of the nine judges of the Supreme Court of Errors within the last twenty years; and the decision has been acquiesced in. No murmurs have been heard respecting it. The reasons should be cogent to compel a departure from such a decision.

Nor am I satisfied, that there is any principle, or precedent of high authority, opposed to it. Two of the judges of the circuit court in *New-York*, at *Nisi Prius*, held, that persons of this description might testify. 2 *Cowen* 432. 572. We

are told, by the reporter, there are *many persons* in those counties where these decisions were had, who deny all future punishment. Why this is mentioned, it is not easy to percieve, unless to suggest a reason for a departure from the rule of the common law, in obedience to public opinion. On these decisions I remark, that they are directly opposed to that of the Supreme Court of the state of *New-York*, in *Jackson* d. *Tuttle* v. *Gridley*, 18 *Johns. Rep.* 98. The court there say, with much force : " Religion is a subject on which every man has a right to think according to the dictates of his understanding. It is a solemn concern between his conscience and his God, with which no human tribunal has a right to intermeddle. But in the developement of facts, and the ascertainment of truth, human tribunals have a right to interfere. They are bound to see, that no man's rights are impaired or taken away, but through the medium of testimony entitled to belief; and no testimony is entitled-to credit, unless delivered under the solemnity of an oath, which comes home to the conscience of the witness, and will create a tie arising from his belief that false swearing would expose him to punishment in the life to come. On this great principle rest all our institutions, and especially the distribution of justice between man and man." In this opinion I entirely concur.

The judges above mentioned at the circuit, in commenting on this case, say, that the opinion was *obiter ;* that the witness rejected did not believe in the existence of a God, *or a future state,* and therefore was incompetent according to all the decisions. It is true, there was this farther objection to his testimony; but still, the court, in giving its opinion, expressly decides on his disbelief in future punishment, and declares it to be a disqualification, quoting, with high approbation, the decision of *Curtiss* v *Strong,* 4 *Day* 51.

It is also said, that this decision rests, for much of its support, on the case of *Omychund* v. *Barker,* reported in *Willes* 549. and 1 *Atk.* 45. ; and that the report of the case by *Atkyns* is incorrect, and that by *Willes* gives the true state of the case. To this I would observe, that *Atkyns* furnished the case from the judges themselves, and when the decision was pronounced. With his accuracy as a reporter, it is not credible, that he should have omitted what is now deemed important in the opinion of *Willes.* On the other hand, *Willes'* Reports were not published in more than half a century after the decision :

Litchfield,
June, 1828.

Atwood
*v.*
Welton.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

and the manuscript was furnished by his grandson. But the point in decision, in that case, was not, whether the disbelief in future punishment disqualified the witness. It was, whether the depositions of certain *Gentoos,* sworn according to their religion, should be admitted, in relation to transactions, which took place in their country, between a native thereof and the defendant, an *Englishman.* All the judges, in giving their opinion, lay stress upon that fact ; and there was no proof as to the point of the belief or unbelief of the deponents in future punishment.

There was a consideration presented by the counsel for the plaintiff, which, by their ingenuity, was rendered plausible ; and therefore, is deserving of attention. It was urged, that there are certain religionists, denominated *Antinomians,* who hold that the Gospel releases Christians from all the obligations of morality, and in close connection with this doctrine is that of the *faith of assurance, absolute election,* and the *final persever-ance of the saints.* And it is hence said, that if a person is *fully assured* of his own election to eternal life, and of his *per-severing* in that state, he can have no fear of future accounta-bility or punishment, and therefore will not feel the obligation arising therefrom, in his testimony. This is not the place for considering that subject. I will, however, say, that if it should be proved respecting any person offered as a witness, that he believed his own happiness secure at death, *regardless of his conduct in this life,* he ought not to be sworn ; nor would it be any recommendation of him as a witness, that he entertained this opinion of *himself and his own sect only.* He should be excluded as not feeling the obligation of an oath.

It is urged again, that courts have no right to interfere with religious opinions. It is said, faith is a matter between men and their God, and ought not to be examined by courts or the legislature. But it is declared, by the judges in *England,* that Christianity is a part of the common law of the land. Our ancestors brought it with them to this state, and there is no statute abrogating it. Nay, our statute (*p.* 164.) punishes, by fine, imprisonment, and binding to good behaviour, persons guil-ty of blasphemy against God, either person of the Trinity, the christian religion, or the holy scriptures ; and in *p.* 165. profane swearing, and in *p.* 385. violations of the Sabbath, are punished by fine    Our constitution declares it to be the duty of all men to worship the Supreme Being according to the dic-

tates of their consciences.    These  provisions do not look like   *Litchfield,*
annulling Christianity.    The  law does  not,  indeed,  prescribe   June, 1828.
any rules of faith, nor mode of worship, nor  attempt to enforce   Atwood
practic al  piety :—it  simply  recognizes the  great doctrines  of   *v.*
Christianity, and preserves them from the open assaults of their   Welton.
enemies.    This is all a  legislature or  court can  rightfully do.
But it is not easy to see how there  is any interference with re-
ligious faith, in deciding a person professing certain opinions to
be unfit to be sworn.    What if a man should claim  the right of
making his *simple declaration*, and  that it  should be  received
*without oath*, because his conscience  told  him that an oath did
not add to the obligation to speak the truth ;  shall such a dec-
laration  be received to affect  important  rights ?    What if a
witness  should  declare, that there was no God ;—that he  be-
lieved in no God, and worshipped none ;—shall he  be  permit-
ted to appeal to God, and imprecate his vengence if he  speak
falsely ?  This would be the first-born of  absurdities !—Yet be-
lief in  God lies at the foundation of  all true religion.    Hence,
the court may, as it is universally conceded, ascertain the re-
ligious belief of a witness.    And surely it must be done, by en-
quiring into the religious faith.

It has been said, however, that this decision  in excluding the
witness,  is a  violation  of  the  constitution  of  the  state.    I
presume this argument rests on the 3rd and 4th sections of the
declaration of rights.    The 3rd section is :  " The exercise and
enjoyment of religious profession and worship, without discrim-
ination, shall forever be  free to all persons in this state."    The
4th section is:  " No preference  shall be  given  by  law to any
*Christian* sect or mode of worship."    It is less difficult to  see,
that neither of these sections can have any possible bearing on
the point in judgment, than it is to  answer such mere  vagaries
of the imagination.    The plain meaning of these provisions, is,
to secure  an entire freedom in  religious  profession and wor-
ship, and an entire  exclusion by law of any preference  to any
sect or mode of  worship.    No  man  shall  be  prohibited  from
professing  what  religion he  pleases,  or  worshipping  in any
manner he pleases ;  nor shall  there  be  any religious establish-
ment, or approximation  towards it,  by any law giving any pre-
ference  to  any sect  or  mode of worship.    We know, that it
had been  insisted  by many, that formerly our laws conferred
certain  privileges on the located societies, and thus gave a pre-
ference to certain *Christian* sects beyond what was  conceded

to other denominations of *Christians.* It cannot be material to enquire whether such preference *was given,* or not. The constitution designed to remove every possibility of legislative interference in future.

But cannot a person be free in his profession and worship, who is excluded from giving testimony, on the ground of his denial of all liability to future punishment ? How does his exclusion affect his belief, profession or mode of worship ? It has no possible bearing on either.

But his rights are infringed, or he is disturbed in the exercise and enjoyment of them    What right ? Doubtless the right of giving testimony. This is a new right, privilege or franchise, unknown, and therefore, undefined, and I may add, unheard of before, by any lawyer or judge. Suppose an elector of *Connecticut* was to appear in a court, and claim the *privilege* of testifying in a cause on trial. Neither the plaintiff nor the defendant has called him as a witness, or desires his testimony. He persists, however, in the exercise of what he calls his *franchise,* until the court, in the exercise of its discretion, is obliged to commit him for contempt, for thus disturbing the rights of the court and of the parties.

The party may be injured, by the improper rejection of a witness, on the ground of his principles ; so he may in a thousand other instances ; but it is incomprehensible how the proposed witness can be, in any way, affected. If a court should reject a witness, because he was not six feet high, (if such a supposition may be made) it might deprive a party of important testimony, and thus injure him ; but it could not affect the witness.

Moreover, if the witness who denies all future punishment, cannot be excluded, without a violation of the constitution, neither can the *Atheist.* His language may be—" *I deny the existence of God,—the immortality of the soul,—and insist, that men die like brutes. This is my religious profession.*" I have before shewn, that it would be the height of absurdity for the court to permit such a person to *appeal to God* for the truth of what he asserts. Yet how can he be excluded, if this objection is to prevail ?

It may be added, that this objection arising out of the constitution, was not suggested, by the able and ingenious counsel, who argued the cause before this Court. It may be presumed, therefore, to have had no weight, in their opinion.

There is an opinion, said to be sanctioned by gubernatorial *Litchfield,* authority, that "*Connecticut* is an asylum for all sorts of con-　June, 1828. sciences." Without saying that such an opinion is better suited to a festive occasion *ad captandum vulgus,* than to cherish ele-　Atwood vated sentiments of religion, law, or government, I would say, 　　*v.* 　　Welton. if thereby it is meant, that all sorts of consciences are here *tolerated,* it is doubtless true ; but if it be farther intended, that witnesses *with all sorts of consciences* are equally entitled to credit, it is denied. There are, at least, two sorts of con- sciences, somewhat variant in their properties. There is "a conscience void of offence towards God and towards man ;" and there is a conscience "seared as with an hot iron." The *latter* should not seek an exclusive asylum ; the former should also be *tolerated.* Shall we be compelled to give equal credit to the man who denies future accountability and punishment, with the man who believes them ?

I come then, necessarily, to the result, that as an oath is an indispensable means of ascertaining truth in a court of justice, so the oath necessarily implies the existence of a God, and a belief in a future state, and a punishment, of some duration, in that future state ; and that a witness who has no belief in these truths, is not a competent witness.

A new trial, therefore, must be granted.

Hosmer, Ch. J. and Lanman, J., were of the same opinion.

Peters, J. I cannot concur in the opinion of Judge *Dag- gett,* in which I understand him to hold, that a person profess- ing to believe in a Supreme Being, and that men are punished for their sins in this life, but are all made happy, by their Crea- tor, immediately after death, is not a competent witness ; though I fully concur in the decisions of the three great cases chiefly relied on, by him, which it was not the intention of the court below to deny or impugn. If this case cannot be dis- tinguished from them, a new trial ought to be granted.

By the ancient common law, *Christians* only were allowed to be sworn as witnesses ; (*Co. Litt.* 6. *b.* for an oath was con- sidered as of *Christian* institution. "An oath," says Lord *Coke,* "is an affirmance or denial, by a *Christian* man, of any thing lawful or honest before one or more that have authority to give the same, for the advancement of truth and right, calling Al- mighty God to witness that his testimony is true." 3 *Inst.* 165.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

*cap.* 14. And in *Calvin's* case, 7 *Rep.* 17. he informs us, that " all infidels are in law perpetual enemies ; for the law pre-sumes not that they will be converted, that being a remote possibility ; for between them, as with the devils, whose sub-jects they be, and the *Christian*, there is perpetual hostility, and can be no peace." Such was toleration in the seventeenth century, " in the reign of the most high and most illustrious king, the fountain of all *piety* and *justice*, and the life of the law !" 7 *Rep. title-page.* This notion, advanced by so great a judge, so contrary to common sense and common humanity, though sometimes doubted, (2 *Hale's P. C.* 279.) was con-sidered as law, until 1744. *Peake's Ev.* 148. *Swift's Ev.* 48. 1 *Atk.* 21, 2. and authorities there cited.

" In the gloomy days of superstition and ignorance," says *Dane*, " a man could not be a witness, who did not believe in the religion of the country, in which he was called to give evi-dence. Those who did not believe in *Christianity*, and some-times in *Christianity* of a particular description, were deemed incapable of binding themselves by oath But an infidel is a witness, if his infidelity extend not to atheism, both in *England* and in the *United States*, though this was not always the case." 3 *Dane's Abr.* 535.

In *Omychund* v. *Barker*, 1 *Atk.* 21 a more liberal principle was recognized and established. In a bill in chancery before Lord *Hardwicke*, assisted by the two Chief Justices and the Chief Baron, the deposition of certain *Gentoos*, who believed in a God, as the creator of the universe, the rewarder of virtue and the avenger of vice, and had been sworn according to the usage of the *Bramins*, by touching the hand and foot of a priest, were offered in evidence ; to which two objections were made, 1. that the deponents were not *Christians ;* and 2. that they were not sworn upon the *Evangelists.* These objections were argued, by the most eminent advocates of that day; and the judges delivered their opinions *seriatim.* They unanimously agreed, that the testimony of *all infidels who were not atheists,* was to be received ; and that upon the principles of the com-mon law, there was no particular form essential to an oath to be taken by a witness, but as the purpose is to bind the con-science, every man of *every religion* should be bound by that form, which he thinks will bind his conscience most. *Peake's Ev.* 149. (ed. 1809.) *Atcheson* v. *Everett, Cowp.* 389.

These were the only points made and decided ; and it is re-

markable, that neither of the learned counsel, nor of the more *Litchfield,* learned judges, intimated that a belief in future rewards and June, 1828. punishments was essential to a witness.

Atwood
*v.*
Welton.

Chief Justice *Willes* is, indeed, made to say, that infidels who believe a God, and future rewards and punishments in the other world, may be witnesses; yet if they [infidels] do not believe a God or future rewards and punishments, they ought not to be admitted as witnesses.   1 *Atk.* 45.   But in his own report of his own opinion, he says : " Nothing but the belief of a God, and that he will reward and punish *us* according to our deserts, is necessary to qualify a man to take the oath."   *Willes' Rep.* 545.   Again : " Infidels, who believe a God, and that he will punish them, if they swear falsely, in some cases, and under some circumstances, may and ought to be admitted witnesses, in this, though a *Christian* country.   On the other hand, I am clearly of opinion, that such infidels, if any such there be, who either do not believe a God, or if they do, do not think he will either reward or punish them, in *this world* or the next, cannot be witnesses, in any case, or under any circumstances, for this plain reason, because an oath cannot possibly be any tie or obligation upon them."   *Willes' Rep.* 549.   Again : " Supposing an infidel who believes a God, and that he will reward and punish him, in *this world,* but does not believe a future state, be examined on his oath, as I think *he may,* and, on the other side, to contradict him, a *Christian* be examined, who believes a future state, and that he shall be punished in the next world, as well as in this, if he does not swear the truth, I think the same credit ought not to be given to the infidel as to the *Christian,* because he is plainly not under the same obligation." *Willes' Rep.* 550.

From the remarks of the judges it is apparent, that they concurred in the opinion actually given by Ch. J. *Willes,* and quite certain, that they did not contradict him.   "If my Lord *Coke,*" said the Chief Baron, " had, by an infidel, meant a professed atheist, I should have been of opinion, that he could not be a witness."   Again : " As to the *Gentoo* religion, it will appear from the best testimonies, that persons of this religion do believe in God as the creator and governor of the world."   1 *Atk.* 40.   " I agree entirely," said Ch. J. *Lee,* " with Ch. J. *Willes* and Ch. Baron *Parker,* that where it is returned by the certificate, that the witness is *of a religion,* it is sufficient; for the foundation of all religion is the belief of a God."   1 *Atk.*

Litchfield,
June, 1828.

Atwood
v,
Welton.

46.   The Lord Chancellor concurred with the judges, and said : " The rule is, that all persons who believe a God, are capable of an oath." 1 *Atk.* 20.   Again : " My intention was to be certified, whether these people believed the being of a God and his providence."—" The first author I shall mention is Bishop *Sanderson, De Jurisjuramenti Obligatione. Jurisjuramentum,* saith he, *est affirmatio religiosa.*   All that is necessary to an oath, is an appeal to a Supreme Being, as thinking him the rewarder of truth and avenger of falsehood."   1 *Atk.* 48.

The latest *English* writer on this subject, upon a review of all the cases, concludes, by saying : " It seems sufficient, if he [the witness] believes in a God, who will reward or punish him in this world." *Saund. on Plead. & Ev.* 940.

Such is the basis of the modern doctrine, that a belief of *future* rewards and punishments is essential to the competency of a witness !   But, if the foundation fail, where is the superstructure ?

In *Curtiss* v. *Strong,* 4 *Day* 51. it was correctly decided, that a person who did not believe in the obligation of an oath, was not a competent witness.   So in *Jackson* v. *Gridley,* 18 *Johns. Rep.* 98. the supreme court of *New-York,* with perfect propriety, rejected the testimony of an atheist ; and so did Judge *Story* in *Wakefield* v. *Ross,* cited by Judge *Daggett.* But if these learned judges had contented themselves with deciding the cases before them, they would have been as silent as Lord *Hardwicke* and his advisers respecting a belief in the administration of justice in a future world.   But zeal to establish a favourite dogma seems to have led the mind of a great and learned judge into an error, not only with respect to the *English* law, but with respect to the language of an *English* judge. " By the law of *England,*" says Ch. J. *Spencer,* " which has been adopted in this state, it is fully and clearly settled, that infidels who do not believe in a God, or if they do, do not think that he will either reward or punish them in the world to come, cannot be witnesses in any case, nor under any circumstances, because an oath cannot possibly be any tie or obligation upon them." 18 *Johns. Rep.* 103.   This certainly is not the language of the court in *Omychund* v. *Barker,* but is the precise opinion of Ch. J. *Willes,* as reported by him, omitting " this world or the next," and inserting " the world to come."   " Infidels," says *Buller,* " cannot be witnesses,—*i. e.* such as profess

no religion that can bind their consciences to speak the truth ; *Litchfield,* June, 1828.
but when any person professes a religion that will be a tie upon
him, he shall be admitted as a witness." *Bul. N. P.* 292. And — Atwood
*Wooddeson* says : " The case of men wholly without religion, *v.* Welton.
(if any such there be) may justly be thought a reasonable and
lawful objection to bearing testimony in any cause or trial
whatsoever." 3 *Wooddes.* 281, 2. Another writer says : " And
in order that persons should be permitted to testify, it is suffi-
cient if they profess a religion and belief in the Deity, which
will be a tie upon them to attest the truth." *Esp. Dig.* 726.

In conformity with these principles, in 1804, at the *Old Bai-
ley,* a native of *China,* being examined before Baron *Graham,*
on an indictment for felony against *Ann Alsley* and another,
was sworn according to the form of the courts in *China,*
by holding a saucer in his hand, which he dashed to pieces at
the conclusion of the oath, believing, as he stated, that God
would cause his body to be cracked as he cracked that saucer,
if he did not tell the truth. *Peake's Ev.* 149. n. (ed. 1809.)
When and where did this *Pagan* believe, that the vengeance of
Heaven would overtake *the body* of the perjured witness?
Surely, not in the world to come. Notwithstanding the strong
opinion expressed by Ch. J. *Spencer,* his *dicta* have been dis-
regarded, by several learned and respectable judges of that
and other states.

Thus, in *Butts* v. *Swartwood,* 2 *Cowen* 431. *Southerland,* J.,
in delivering the opinion of the supreme court, said : " The
proper test of a witness' competency, on the ground of his
religious principles, is, whether he believes in the existence
of a God, who will punish him if he swears falsely."

So, in *Matteson's* case, cited 2 *Cowen* 433. n., a witness was
offered, who did not believe in any future punishment after this
life ; and *Walworth,* Cir. Judge, now Chancellor, said : " I ap-
prehend the true test of the competency of a witness to be this :
has the obligation of an oath any binding tie upon his conscience?
Or, does the witness believe in the existence of a God, who
will punish his perjury ? If he swears falsely, does he believe
he will be punished, by an overruling Providence, in *this world,*
or the world to come ? If he does not believe in the existence
of a God ; or if he believes in no punishment, except by hu-
man laws ; no obligation or tie can have any binding force
upon his conscience. But if he believes, that he will be pun-
ished, by his God, even in *this world,* if he swears falsely, there

*Litchfield,*
*June, 1828.*

Atwood
*v.*
Welton.

is a binding tie upon the conscience of the witness, and he must be sworn." This judge fully recognized the opinion of Ch. J. *Willes,* as reported by himself, and added : " That part of the opinion of Ch. J. *Spencer,* which relates to punishment in another world, was an *obiter dictum,* and wholly unnecessary to decide the case before the court. In this opinion I am supported, by most, if not all, the circuit judges."

A similar opinion was given, by *Williams,* Cir. Judge, upon the precise question before us, *viz.* whether a person who believes in a God, and in rewards and punishments in *this life only,* may be a witness. 2 *Cowen* 573.

The same opinion upon the same point, was given by Chancellor *Desaussure,* of *South-Carolina,* in *Fernandis* & al. v. *Henderson,* in equity, *Union* district, *August* term, 1827, upon a laborious investigation of all the cases on this subject.

And in the case of *Hunscom* v. *Hunscom,* 15 *Mass. Rep.* 184. the supreme court of *Massachusetts* decided, that a person who did not believe in a future state of existence, was a competent witness.

Finally, there is nothing in the case before the court, to shew, that the creed of this witness is materially variant from that of a considerable class of *Universalists,* who believe in the existence of a God, the authenticity of the scriptures, and the divinity of the Saviour, but deny that there is any punishment for the wicked after this life. 2 *Cowen* 432. n.

A contrary creed on most of these topics was once, by statute, classed among " *capital and other felonies,*" and rendered its possessor not only incapable of holding an office, but of suing or defending in a court of justice. But this statute has been repealed, because it was repugnant to the constitution. If the legislature cannot disfranchise a citizen, on account of his religious sentiments, *a fortiori* a court of justice cannot, for the same cause, deprive him of the power of vindicating his rights, by his own testimony, in " due course of law." If the principle now sanctioned, by this court, be carried into full effect, the most atrocious crimes may be committed with impunity, unless perpetrated in the presence of an *orthodox* witness. Vid. *Const. Conn. art.* 1. *Stat. tit.* 16. *c.* 1. (ed. 1808.) *lib.* 2. *p.* 425.

2. The remaining questions are of minor consideration ; but they must be disposed of. It is a well settled rule, that a witness cannot be cross-examined concerning a collateral fact ir-

relevant to the issue, for the purpose of impeaching his testi- *Litchfield,* mony, by contradictory evidence.   *Spenceley* q. t v. *De Wil-* June, 1828. *lott,* 7 *East* 108.    But if he is so examined, his answer is conclusive.

*Atwood v. Welton.*

It is also a rule, that a witness cannot be examined concerning any fact, which tends to degrade or disgrace him.   2 *Stark. Ev.* 139.   *Cook's* case, 1 *Salk.* 153   *Northrop* v. *Hatch,* 6 *Conn. Rep.* 361.   The issue in the case before us, is, usury or not.   The evidence in question neither proved nor disproved it.   The enquiry certainly tended to disgrace the witness ; but the answer ought not to be drawn from him ; for, to be suspected of harbouring such vindictive feelings towards another as would induce a commission of perjury for the sake of revenge, is certainly a disgrace.   *Peake's Ev.* 136.   *Rex* v. *Lewis* & al. 4 *Esp. Rep.* 225.   *McBride* v. *McBride,* 4 *Esp. Rep.* 242.

But the practice on this subject seems not to be well settled. *Peake's Ev.* 130   2 *Stark. Ev.* 139.   In my opinion, the rule is, or ought to be, the same as in proving a witness interested, *viz.* by examining him on the *voir dire,* or proving his interest by other testimony, but not by both.   The election of one mode precludes the other.   The reason is the same in both cases. " It is certainly unreasonable," said the court, in *Butler* v. *Butler,* 3 *Day* 204. " that the party should be permitted to sport with the conscience of the witness, when he has other proof of his interest."   *Stebbins* v. *Sackett,* 5 *Conn. Rep.* 150.   *Chance* v. *Hine,* 6 *Conn. Rep.* 231.

3. The authorities which admit witnesses of the faith in question, seem to take it for granted, that their incredibility is as their infidelity ; and that the ratio must be settled by the jury ; but they furnish no rule to ascertain the effect of speculative opinions upon the consciences of witnesses.   By what standard is their testimony to be weighed ?   The jury have none but their own sectarian prejudices.   What confidence has a *Christian* in the testimony of a *Mahometan,* who believes that paradise is his inevitable portion ?   What credit will be given, by a *Protestant,* to the testimony of a *Catholic* with an indulgence in his pocket ?   Or what would be the fate of a *Free-mason,* accused and tried by *Anti-masons,* and *vice versa ?* Let the history of parties and persecutions, from the days of *Mather's Magnalia* to our own times, answer these questions.

The moral character of a witness is the only safe criterion :

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

and, upon this topic, I adopt the sentiment and language of the late Chief Justice : " It may often be difficult to ascertain what are the speculative opinions of men, and how far they influence their conduct.   In the conflict of parties, both religious and political, misrepresentations will often take place ; and it will commonly be safer to rely on *the general character for truth,* which a man has acquired, by his own conduct in society, than on his *mere opinions."*   *Swift's Ev.* 50.

HOSMER, Ch. J. and LANMAN, J., were of the same opinion.

BRAINARD, J. was absent.

New trial to be granted.

NOTE.   A new trial having been granted, in this cause, it came on again for trial before the Superior Court, in *August,* 1828, *Daggett,* J. presiding   The same witness was offered, and the same objection taken to his testimony   Many witnesses were examined relative to the opinions of the witness as to a future state of rewards and punishments.   Judge *Daggett* was satisfied, in view of the testimony, that he was a believer in future, though not endless punishment.   He was, therefore, admitted.