Mr. Chief Justice Johnson delivered the opinion of the Court. The first point made, relates to the legal sufficiency of the indictment. It is objected that it is no where shown in the caption of the indictment, that the gi’and jurors were from the body of the county of Saline. Precisely the same question was presented and decided in 1 Howard's Miss. Rep. at p. 171, in the case of Byrd v. The State. The Court in that case said: “The second question is, does the caption of the indictment show with sufficient certainty that the grand jurors, who found the indictment, were of the county of Warren? By the common law, every man was entitled to a trial by his peers, which peers were good and lawful men of the county where the offence was charged. • This principle of the common law is recognized and established by the Constitution of this State; and the right thus secured should be beyond legislative action. It should appear, then, with reasonable certainty, in the caption of the indictment, that the grand jurors empanneled and sworn to inquire of and presentment make of the guilt or innocence of the party charged, were of the proper county. The caption of the indictment in this case is in the following words, to wit: “The grand jurors of the State of Mississippi, empanneled and sworn in and for the county of Warren,” &c. The grand jury-is constituted to inquire on the part of the State, in the commission of felonies, &c., in their county. The grand jury of any county may therefore, with strict legal correctness, be styled the grand jurors of the State of Mississippi. And when the words are added, that they “were empanneled and sworn in and for the body of the county,” it appears with that degree of certainty required in indictments, that they were of the county for which they are sworn. This legal certainty, so far at least as the prisoner’s safety is involved, is strengthened by the presumption that the court could not issue a venire to any other county in the State; and that it could have issued to summon only the house-holders and free-holders of the county. Courts of Justice are disposed to release the rigor of the ancient forms, when no injury can possibly result to the liabilities or rights of the accused. Under the process of summoning and drawing the grand jury, the accused can always ascertain whether the jurors drawn are good and lawful men of the county, by referring to the list which the clerk is required to keep of those from whom the grand jury must be drawn! See Acts of November session, 1830, page 25. I am therefore of opinion that in this respect there is no error.” The phraseology of the indictment in the case before us, is the same in substance with the one before the court in that, and every facility for ascertaining all the facts in regard to the residence, and other requisite qualifications of grand jurors, that can be desired, are afforded by our Statute in. reference to that subject. See chap. 94 of the Digest. The remarks of the Court, in that case, are strickly applicable to this, and perfectly conclusive of the question. There is no error therefore, in this respect. We will now proceed to dispose of the several other objections made to the judgment of the court below, in the order in which they are presented and discussed in the argument of the defendant’s counsel. The first relates to the action of the court in discharging a juror after he had been sworn in chief. The 155th and 163d sections of chapter 52, of the Digest, declare that “No person who was a member of the grand jury or inquest by which any indictment was found in any cause, or who was a member of a jury of inquisition held by .the coroner or other officer, shall serve as a juror in the trial of such cause.” And that, “If the cause of challenge be discovered after a juror is sworn and before any part of the evidence is delivered, he may be discharged or not in the discretion of the court.” These two sections were approved February 13th, and went into operation from and after the 1st of March, 1838.„ The 20th sec. of chap. 94 of the Digest, also declares that “No exception against any juror on account of his citizenship, non-residence, age or other legal disability, sháll be allowed' after the jury are sworn.” This section was approved Dec. 18th, 1837, but not put into operation until by the proclamation of the Governor, on the 20th March, 1839. The 6th sec.' of chap. 156 of the Digest, provides that,' “For the purpose of construction, the revised statutes, passed at the present session of the General Assembly, shall be deemed to have been passed on the same day, notwithstanding they may have been passed at different times; but if any provisions of different statutes are repugnant to each other, that which shall have been last passed shall prevail; and so much of any prior provisions as may be inconsistent with such last provisions shall be deemed repealed thereby. This section was approved and put in force March 5th, 1838. Under this last provision, in case there is any repugnancy in the several statutes above quoted, the one approved 1 Sth February, 1888, must prevail as the statute settling the construction of the Revised Statutes, looks alone to the time of the passage, and not to that of their going into operation. The juror who was discharged after he was sworn, having been a member of the grand jury that found the indictment, was' clearly laboring under a legal disability and the court had a discretion whether to dischai'ge him or not before any part of the evidence was delivered. ’Tis true that the bill of exceptions is silent as to whether any evidence had been delivered or not, yet the legal presumption is that such was not the case, as but six persons had been sworn besides the one discharged, and for the further reason that such presumption tends to support the action of the inferior ■court. There is no error, therefore, in this respect. The next objection is that the court below permitted Keesee to state in detail, the grounds of his prejudice against the accused. He stated on cross-examination that he was prejudiced against accused, and on re-examination by the State, he was asked to state the reasons why he was thus prejudiced, the defendant objected to this question, but the court overruled the objection, and permitted him to go on in detail and state the grounds of his prejudice. In this the court most clearly erred. A witness may be asked, in cross-examination, for the purpose of contradicting him, whether he has not had a controversy with the party against whom he is called, and threatened to be revenged on him. (Atwood v. Welton, 7 Conn. Rep. 66, 67.) 1 The witness’ state of mind and interest in respect to the party are always pertinent inquiries, for .they go to his credit. (16 Mass. Rep. 185. Swift’s Ev. 148. 1 Starkie’s Ev. 135.) Personal controversy with the party may always be shewn, though the particulars shall not be inquired into. (Swift’s Ev. 148.) The witness in this case does not state any particular act that he has done, or any expression that he has made in reference to the accused, from which the jury might infer a bias or prejudice against him, but he has said in broad terms that he is prejudiced against him. The question submitted to the witness which led to the answer that he was prejudiced, if submitted at all, was clearly illegal, as was the answer, and would have been overruled by the court in case that objection had been interposed in proper time. The witness could have been interrogated as to any particular acts or expressions in reference to the accused from which the jury might have inferred unfriendly feeling or prejudice, but it was clearly illegal to have proposed the question in general terms as the answer did not involve a mere matter of fact, but a matter of legal inference to be drawn by the jury from a certain fact or facts. A witness may be asked whether, in consequence of his having been charged with robbing the prisoner, he has not said that he would be revenged upon him, and in case of denial he may be contradicted. In such a case, the inquiry is not collateral, but most important in order to show the motives and temper of the witness in the particular transaction. A long and tedious detail by the witness of the numerous charges which he has heard against the accused, could not aid the jury in the least possible degree in their deliberations, as they could not thereby ascertain the extent of his prejudice, and consequently could not determine how far such charges should be permitted to go to throw discredit upon his testimony. This' is the only possible use that they could have of a knowledge of such charges, and to what extent they could affect the mind of the witness it could not be within their power or province to decide. The consequences of the opposite doctrine would at once demonstrate its utter futility and absurdity. The question for thd jury to determine is not what it is that constitutes the basis or foundation of the feeling or prejudice that may be entertained by the witness towards the accused, but on the contrary it is as to the existence of such prejudice, and that too to be derived as a matter of legal inference from particular acts or expressions of the witness. An answer of a witness that he is prejudiced against a party might prove much or even nothing at all, depending entirely upon the peculiar notions of the jury and the force and effect that they might put upon such expression. And it must be admitted that if the general question and answer should be conceded tobe admissable, it would necessarily follow that the witness upon re-examination might be permitted to go through a long and elaborate detail of the grounds of his prej udice, in order that the State might have an opportunity of showing that no such grounds existed in fact; and that, therefore, he was necessarily free from all bias or prejudice, or, in some instances, that, in consequence of the' witness’ ignorance of the force and meaning of language, he really did not mean to convey the idea that his expressions would ordinarily import. The effect of such a procedure would be to do indirectly that which the law will not permit to be done directly. When a party is put upon his trial for a particular offence, it is not permitted to the State to show that he has been guilty, or suspected of having been guilty of divers others, unless he shall first throw the gauntlet. In this case, the defendant had not thrown himself upon his general character, and the effect of the re-examination was to disclose his general character and that too by particular acts. We are satisfied therefore that the court erred in overruling the objection of the defendant and permitting the witness to state the specific grounds of his prejudice. The court, it is true, after the witness declared the grounds of his prejudice, informed the jury that the statement was not evidence in the case further than to enable them to determine whether the prejudice of the witness was proper or not. The exclusion of the statement altogether, for every purpose, would not have relieved the defendant from its previous effects upon the minds of the jury. The defendant made his objection at the earliest moment in his power, and it was his right to prevent all irrelevant and illegal matter from going to the ears of the jury, and thereby to insure a fair and impartial trial. The court therefore, in permitting the witness to state illegal matter to the jury, against the objection of the defendant, clearly compromitted his rights and consequently erred. The next ground of objection is, that the court excluded the declarations of the defendant, which, it is contended, constituted a part of the res gestee. The defendant offered to prove, by a Mrs. Seymore, “that, on the night the cow in question was killed, after the cattle of the defendant were turned into the pen, and before the family and others at his house went to bed, he, the defendant, declared openly before his family and in the presence of visitors, that he was going to kill the cow in question, before day and take her to Benton to market, and declared at the same time that he had received a message from Clift, the owner of the cow, which authorized him to kill the cow, and pay for her; that the declarations were made to some three or four grown white persons who were at his house at the time, as well as directions given to the negroes in reference to the matter.” This the court excluded from the jury. The defendant then proposed to prove, by the same witness, that a short time before the cow was killed, she heard Marion Williams, who at the time was living with the defendant, tell the defendant that he had been down tq Clift’s, the owner of the cow, and that he, Clift, told him to tell the defendant that the cow in question had been running about his, defendant’s, place, the winter before, and that if she returned he was at liberty to kill her and pay him two ceñís a pound for her, and that, after receiving said message, the defendant openly declared his intention of killing the cow. This the court also excluded. The defendant then showed that Marion Williams had been subpen sed, that the cause had been twice continued on account of his absence amongst other witnesses; that he lived twelve or fourteen miles from the court house in Hot Spring county, and thai at the commencement of the court he was said to have been very sick, and upon this showing the defendant again offered to prove by the same witness that she heard Williams deliver the message aforesaid to the defendant, but the court still refused to permit her to testify to the delivery of the message. The defendant excepted to the decision of the court in thus excluding the evidence offered by him, and saved the several points by a bill of exceptions in the usual form. The question now to be determined is, whether the matter proposed to be thus introduced to the jury, was mere hearsay, or such matter as constituted a part of the res gestee. Evidence of facts with which the witness is not acquainted of his own knowledge, but which he merely states from the relation of others, is inadmissible upon two grounds: First, that the party originally stating the facts does not malte the statement under the sanctity of an oath; and secondly, that the party against whom the evidence is offered, would lose the opportunity of examining into the means of knowledge of the party making the statement. Where, however, the particular circumstances of the case are such as to afford a presumption that the hearsay evidence is true, it is then admissible. Where the enquiry is into the nature and character of a certain transaction, not only what was done, but also what was said by both parties during the continuance of the transaction, is admissible: for, to exclude this would be to exclude the most important and exceptionable evidence. In this case it is not the relation of third persons unconnected with the fact, which is received, but the declarations of the parties to the facts themselves or others connected with them in the transaction which are admitted ufor the purpose of illustrating its peculiar character and circumstances. Where evidence of an act done by a party is admissible, his declarations made at the time having a tendency to elucidate or give a character to the act, and which may derive a degree of credit from the act itself are also admissible as part of the res gestee. (See Sissions v. Little, 9 N. H. 271.) There are some cases, in which the declarations of a prisoner are admitted in his favor, mainly upon the principle of being part of the res gestee; as to account for his silence when that silence would operate against him. U. S. v. Craig, 4 W. C. C. Rep. 729. So, to explain and reconcile his conduct. State v. Ridgely, 2 Har, & McHen. 129. In th e case "of the United States v. Craig, Washingtost, J., who delivered the charge to the jury, stated that the materiality of his (the prisoner’s) declarations to a witness, that he was going to Johnson’s house for the purpose of obtaining bail for his brother-in-law, Gleeson, which, contrary to his first impressions, he was now satisfied was proper evidence for the consideration of the jury, (1 Stark. Ev. 46, 47 and 48 and cases cited;) depended very much, if not entirely, upon the accordance of his subsequent conduct with these declarations. From that conduct the jury were to judge whether the prisoner was sincere in the avowal of his purpose in going or merely intended to serve a purpose and to provide testimony in his favor in case of need. If in the opinion of the jury the latter was intended, then the prisoner’s declarations of the motive which took him to Johnson’s ought to be entirely disregarded.” The prisoner was found, in that case, by the officer and arrested at the house of a certain Bernard Johnson, and at the time of his arrest he was surrounded by circumstances of the most suspicions character, and in order to rebut the presumption arising from his situation he was permitted to introduce evidence of his own declarations previously made as to the motives that induced him to be at that place. These previous declarations were a part of the res gesta;, as they tended to explain the prisoner’s motive forgoing to Johnson’s. When the state of mind, sentiment or disposition of a person at a given period, become pertinent topics of inquiry, his declarations and conversations, being part of the res gestae, may be resorted to. (See Bartholemy v. The People, 2 Mill 248.) It is laid down by Starkie, in his first volume at pages 46 and 47, that whenever the declaration or entry is in itself a fact and is part of the res gestae the objection ceases. The distinction between a mere recital, which is not evidence, and a declaration or entry, which is to be considered as a fact in the transaction, and therefore is evidence, frequently occasions much discussion, although the test by which the admissibility is to be tried seems to be simple. If the declaration or entry has no tendency to illustrate the question, except as a mere abstract statement, detached from any particular fact in dispute and depending for its effect entirely on the credit of the person who makes it, it is not admissible in evidence: but if, on the contrary any importance can be attached to it as a circumstance which is part of the transaction itself and deriving a degree of credit from its connection with the circumstances, independently of any credit to be attached to the speaker or writer, then the declaration or entry is admissible in evidence. Hence it is, that when the nature of a particular act is questioned, a contemporary declaration by the party, who does the act, is evidence to explain it. Where, for instance, in cases of bankruptcy, the question is with what intent the party absented himself from his house, his declaration contemporary with the fact of departure is evidence to explain that intention. (See Thompkins v. Saltmarsh, 14 Serg. & Rawle 275.) In Lord George Gordon’s case, it was held that the cry of the mob might be received in evidence as part of the transaction. 21st Howell’s St. Tr. 542. In the case of Digby v. Steadman and others, where the question was, whethér the defendants had delivered to Sir J- M. a gold watch which the plaintiff had sent to them to be repaired, and which he had directed them to deliver to Sir J. M.: a witness having sworn that he saw the watch delivered by one of the defendants to Sir J. M., an entry, made by one of the defendants in the usual course of business', of the delivery of the watch to Sir J. M., vthich entry the witness had seen soon after it was made, was allowed to be read in evidence in confirmation of the testimony of the witness. It is to be observed, in such cases, the declaration does not depend so much on the credit due to the party who makes it, as to its connection with the circumstances. In the case of the bankrupt, the declaration which he makes at the time of leaving his house, if his intention of sq doing is founded not upon his character for veracity but on the presumption arising from experience, that where a man does an act his cotemporary declaration accords with his real intention, unless there be some reason for misrepresent-i ing his real intention; its connection with the act gives the de- \ claration greater importance than that which is due to a mere 'assertion of a fact by a stranger, or a declaration by the party himself at another time. Such evidence does not rest upon the credit due to the declarant, but might be admissible even although the declarant, in ordinary cases would not be believed upon his-oath. (See Pool v. Bridges, 4 Pick. 378.) In order to convict tlie defendant in the case at bar, two distinct facts were necessary to be found by the jury. First, that he took the cow; and secondly, that he did so take her with a felonious intent. Here he made declarations previously to, and almost in immediate connexion with the act of killing, calculated to explain itself and to reconcile itself with common honesty. The declarations were just such as the experience of every one; acquainted with human transactions, fully attests to be the natural and ordinary result oí honest and upright intentions. The defendant was aware that the cow belonged to Clift, and he also knew that this fact was well known to his family, and those by whom he was surrounded. Therefore, it was natural that he> when he formed his design td kill her, and take her to market, in order to explain his conduct in so doing, and to avoid even a suspicion of having done wrong, to make known such determination in advance and proclaim the fact. This course, therefore, in thus declaring the fact openly, and without restraint, was perfectly natural and just, such an one as a man conscious of the entire honesty of his motive would pursue under like circumstances. This being true, the declarations of the defendant as to his intention or object in killing the cow, do not depend in the slightest degree upon the credit that might be awarded to him as a man, but solely and exclusively upon the presumption arising from experience, that his contemporary declarations accord with his real intentions. We are fully satisfied, therefore, that the declarations referred to, and which were excluded by the Court, cannot be regareded as mere hearsay evidence, technically so called, but on the contrary, they constitute facts in themselves as forming a part of the transaction under investigation, and as such were clearly admissible, and should have been placed before the jury for what they were worth as tending to elucidate or explain the conduct of the defendant. The Court also erred in refusing permission to the witness, to testify in relation to the message which the defendant claimed to have received from the owner of the cow, and by which he in-, sisted he was authorized to do what he had done. The rejection of this testimony cannot be justified either upon the ground of hearsay, or upon that principle of the law which requires the best evidence of which the nature of the case is susceptible. The evidence itself was clearly competent as tending to negative a felonious intent, and the party who bore the message to the defendant would have been no better witness, than one who was present and heard it delivered, as it was wholly immaterial whether the message was true or false, in case the defendant acted in good faith, and under a belief that it was true. If the truth of the message had been involved, the aspect of the case might have been somewhat different; but when it is considered that the defendant was authorized to act upon it, whether true or false, it is obvious that the fact of its delivery was the only material matter, and that consequently, it could be proven by the person who was present and heard it delivered, as well as by him who actually bore and delivered it. We think that the same doctrine which we have already held in relation to the defendant’s declarations to his family, and others at his house, immediately preceding the act of killing, would clearly admit those which he made to Morris a short time before,, since they were made with direct reference to the transaction involved, and tend more or less to explain the nature of it, and to negative the idea of a felonious intent arising from its having been in the night time. After having proved by Morris that the defendant had engaged to bring him beef on a particular morning, he offered to prove by him, that he told hi iff (witness) that he had no beef of his own, but that there was one at his house belonging to one of his neighbors, which he would kill and pay for, and that he had permission from the owner to do so. Here was a declaration made by the defendant the day before the cow was killed, and directly in reference to that matter, and thereby announcing his intention to kill the cow openly and without the least reserve. This, therefore, formed a fact in itself which formed a part of the very transaction, and consequently, was competent to go to the jury, to weigh more or less according .as it should accord with the subsequent conduct of the defendant These declarations should have been received, not as testimony going to disprove a felonious intent in the killing of the cow, but merely as a fact to rebut such a presumption arising from silence and secrecy in the movements of the defendant. The next objection relates to the admissibility of the evidence of Mrs. Whitley. She was introduced to show that her husband testified under a bias or prejudice against the defendant. This evidence was ruled out by the court. It is stated in Roscoe’s Cr. Ev., at p. 148, that “It is not in every case in which the husband or wife may be concerned, that the other is precluded from giving evidence. It was indeed in one case laid down as a rule, founded upon a principle of public policy, that a husband and wife are not permitted to give evidence which may tend to crimi-nate each other. Per Ashuest, J., R. v. Clinger, 2 T. R. 268. But in a subsequent case, the court of King’s Bench, after much argument, held that the rule, as above stated, Was too large, and that where the evidence of the wife did not directly criminate the husband and never could be used against him, and where the judgment founded upon such evidence could not affect him, the evidence of the wife was admissible. R. v. All Saints Worcester, K. B. Easter Term, 1817. If the wife in this case had been in-, troduced to contradict her husband under oath, a doubt might have arisen, as it would have been virtually to charge him with perjury, but such would not have been the effect in case she had been permitted to testify. He did not state positively whether he had ever threatend the ruin of the defendant or not,- but simply that he did not recollect what he had said upon that subject. If therefore, she had sworn in the most positive and unequivocal terms, that she had heard him make the threat, it would not have contradicted him, and consequently would not have criminated him. We think therefore, that, under the state of case here presented, she might have been permitted to answer the question propounded by the counsel for the defendant. The next and last ground of objection is, that the jury who sat upon the trial separated without leave of the court or consent of the parties. The High Court of Errors and Appeals of the State of Mississippi, in tbe case of McCann v. The State, after referring to tbe authorities, said, “Thus some modern authorities can be found of instances where juries have separated without authority of court, or jurors have separated from their fellows, or persons have intruded upon juries in their retirement, in which the irregularity has been held not to impair the verdict. 1 Dev. & Bat. 500. 1 Black. 25. 12 Pick. 496. But .these are mostly cases where evidence excluded the presumption that there was either influence, partiality, or undue excitement on the part of the jury —cases of a mere exposure to undue influence, but in which that exposure has been affirmatively shown to have produced no consequences of any kind. The effect of such an exposure, however, of which no explanation is given as to the extent of its influence, presents a subject of different consideration. Under such circumstances the jealousy with, which the purity of verdicts is watched becomes immediately aroused, for the latest authorities hold, that if the irregularity has a tendency to affect the rights of the party, it is sufficient to warrant its being set aside. Such a conclusion may be legitimately deduced from the opinion in the case of the Commonwealth v. Roby, 12 Pick. Nor is this a new doctrine, for it was said by all the judges in Lord Delamere’s case, 4 Harg. St. T. 232, that “an officer is sworn to keep the jury, without permitting them to separate, or any one to converse with them, for no man knows what may happen; although the law requires honest men should be returned upon juries and without a known objection, they are presumed to be probi et le-gales homines, yet they are weak men, and perhaps may be wrought upon by undue applications.” The evil to be guarded against is improper influence, and when an exposure to such an influence is shown, and it is not shown that it failed of effect, then the presumption is against the purity of the verdict. In the case before us, one of the jurors, Silas McMurran, is shown to have been separated for a short time from his fellows, but as to him it is shown affirmatively that no improper or undue influence could have been exercised. It seems that others also were seen passing in the street, but it is not shown who they were, or that any influence was exercised over them. It should at least have appeared who they were, as without that fact it would have been impossible for the State to have negatived the legal presumption of undue influence. This objection, therefore, was not well taken. We are satisfied, from a full view of the whole case, that there are divers errors in the judgment of the Circuit Court, and that consequently the same ought to be, and is hereby reversed, annulled and set aside, and it is ordered that this cause be remanded to said Circuit Court, to be proceeded in according to law, arid not inconsistent with this opinion.