STATE OF IOWA V. ALBERT McKINSTRY, Appellant.

**Larceny:** SUFFICIENCY OF EVIDENCE. Evidence that the prosecuting witness, on the morning of the theft of his harness, found tracks leading from his barn to a place where a horse and cart had been hitched, and followed the tracks of the cart to within a short distance of defendant's home; that it rained just before the theft; that two tracks, evidently made by the same vehicle, were plainly seen; that a cart was found standing in defendant's yard; and that the harness was found two days afterwards in a box which defendant was shipping to another state,—is sufficient to sustain a conviction, notwithstanding evidence tending to show an alibi and that defendant purchased the harness from third persons.

**Practice:** OBJECTION AFTER A WER. An objection to questions asked defendant's mother as to an alleged conversation with the county attorney about fixing the papers so that defendant might escape, comes too late, after the defendant has answered.

**Impeachment:** ATTEMPT BY WITNESS TO BRIBE: *Cross-examination.* The fact that defendant's mother attempted to bribe the county attorney to fix the papers so that her son might escape, is relevant, and may therefore be shown in contradiction of the testimony of the mother, brought out by the state on cross-examination.

*Appeal from Washington District Court.*—HON. A. R. DEWEY, Judge.

WEDNESDAY, DECEMBER 9, 1896.

THE defendant was convicted of the crime of larceny, sentenced to imprisonment for nine months in the county jail, and to pay a fine of one hundred dollars, and costs, and appeals.—*Affirmed.*

*D. P. Stubbs* and *C. W. Coykendall* for appellant.

*Milton Remley*, attorney general, *S. W. Brockhart*, county attorney, and *Jesse A. Miller* for the state.

KINNE, J.—I.   The facts are, that a set of double harness the property of one C. B. Morgan, was, on the night of May 25, 1895, stolen from his barn; that it was found on the following Monday (May 27), in a box in the defendant's possession, among other goods, which defendant was loading into a car, preparatory to shipping it to the state of Kansas.   When the officer went to make the arrest, the defendant attempted to run away, but this act appears to have been to avoid the service of an original notice in a damage case against him.   The harness was taken on Saturday night, and after half past ten o'clock P. M.   It was found to be missing the next morning, whereupon Morgan and others began looking for tracks leading from the barn.   It had rained the afternoon before the harness was taken, so that tracks could readily be seen.   First, he found the tracks of a man, and after he had gone about sixty rods, he saw where a horse and cart had been hitched.   He testified that "there is a road runs to where the cart appears to have been hitched.   There the road turns and goes south a little bit, just where the cart was hitched.   The cart had come down the main road, and went down by some willows,—right there. I could see that there was just two tracks coming and going east, seemed to have been made by the same cart. Can't tell which way the cart was going, but the horse. I could see that there had been one going each way. Just two tracks. One track up, and then back the same way.   From there where the cart had been hitched, they went south forty rods, to the place marked 'Cart Hitched.'   Then went due east pretty near three-fourths

of a mile, to the corner marked 'Horning.' The tracks then turned north one hundred and twenty rods, then east one-half mile. The cart followed along the road past the place marked 'Cyrus Dickenson'; went right by his house. From there pretty near a quarter down to Sec. 15, to the northwest. The track went across what is called 'McKay's Bridge.' It goes about eight rods due north again. There are two roads there. One went east by Mary Lury's. It turned at the corner of Sec. 4. Andy Myers owns the land. It then turned east at the corner of the section line. It then runs north, and follows up by the church. At the church, I got bothered by some tracks there, and stopped to examine the track. I passed some parties after I stopped there, trying to get on the right track. One of them was an old gentleman, by the name of Churchill. I kept the same track, and followed it north to the next corner, and then turned east. At the corner of the land marked 'J. B. McCaleb,' the track continued to McCaleb's corner. Then the track took right east on that road. I followed east from McCaleb's corner three-fourths of a mile. I then turned round, and went back. The tracks of the horse and cart were plain. They were plain in all of the road, with the exception of this last road. This road was not traveled much, and they took along the north side of the road, between a little patch of hazel brush and the fence. There had been no other cart along there. There was a short distance there had been a spring wagon, and there, at that place, it was only a short distance, and didn't amount to much. That was all the tracks there was on the road that morning until after I went along. Right along there by Mary Lury's I saw tracks of a man. There were tracks there where the cart had backed and forwarded; then went ahead. I took it to be the same track. There was no one with me when I was

doing this tracking, part of the way.  My brother and hired hand were with me at the start.  Some person was with me after they left."  A cart was found standing in the yard at the farm of the defendant's father, which was about ten miles from Morgan's place.  Defendant was at the time living at his father's home.  There was some evidence that the shoe track seen by Morgan and others corresponded in length to the length of the defendant's shoe.  The cart appears to have been traced to within a quarter of a mile of the defendant's place of residence.  A light rig was heard to pass along the road about one o'clock A. M. of the night the harness was stolen, going in the direction of the defendant's residence.  The person in the cart seems to have got out about half way between Morgan's and the place where the defendant resided, and shoe tracks were found there like those at Morgan's place.  Such are, in substance, the facts established by the state.  The defendant introduced evidence which tended to show that there was only one track over a part of the road; that the cart at defendant's father's place had not been moved or used for several days prior to the night on which the harness was taken; that there were no horses at the father's place with two shoes on; that a fruit-tree man had been over the road in a cart on the evening of the twenty-fifth.  The defendant was a witness, and, in explanation of his possession of the stolen property, says that about one o'clock on the twenty-sixth (Sunday), he started with his team and wagon to his father's other farm, and that on the way he met a team and two men who had the harness, and bought it of them; he had never seen them before, and did not know them.  He had a box in his wagon, with some old harness in it.  This he emptied, and put the harness in controversy into the box, nailed it up, put a wire around it, and went on.  One Churchill claims to have seen these

men some time prior to the alleged purchase of the harness, and to have examined the harness, and swears it was the same harness afterwards found in the defendant's possession. Another party claims to have seen these strangers on the road. The defendant shows by his own evidence, by his mother, father, and the hired man, that he was home at ten o'clock that night, and slept there until morning. All of them save the defendant testify that they do not know that he was out of the house during the night, and think he was not out. The state showed by a witness that he saw the defendant pass his house on Sunday; that soon thereafter he went over the same road the defendant traveled; that he did not see the defendant or the strangers of whom it is alleged the harness was purchased.

The foregoing is the substance of the more important facts developed upon the trial. It is said the evidence did not warrant the conviction of the defendant. If the defendant's witnesses are to be believed, he is an innocent man. There are, however, many facts in evidence which warranted the jury in disregarding much of the evidence adduced for the defendant as unworthy of credit. It is evident that the jury must have disregarded the evidence relating to the alibi as being untrue. It appears to us that, in the light of all the evidence, they were justified in so doing. Indeed, much of the defendant's evidence is of a doubtful character, and some of it is in contradiction of facts which are established beyond controversy.

II. An objection to the questions asked defendant's mother relating to an alleged conversation with the county attorney about fixing the papers in this case, so that her son might escape, is said to have been erroneously overruled. The objection was made after the witness had answered

and was too late. *State v. Moore,* 25 Iowa, 128; *State v. Benge,* 61 Iowa, 658 (17 N. W. Rep. 100).

III.  The county attorney was permitted, over the defendant's objection, to testify that defendant's mother attempted to bribe him, and induce him to so fix the papers that her son might get out.  The objection was that the evidence was irrelevant and incompetent, and that the state is bound by the evidence of the mother, and cannot contradict it as to irrelevant matter called out by it.  It may be conceded to be the general rule that, if a witness is cross-examined on a matter collateral to the issue, his answer cannot thereafter be contradicted by the one drawing out such collateral matter.  *Swanson v. French,* 92 Iowa, 695 (61 N. W. Rep. 407).  The matter inquired about in this case, and as to which it was sought to contradict the mother of defendant, was not irrelevant or immaterial.  Surely, it is competent to show, under such circumstances, that the witness had virtually attempted to bribe the prosecuting officer, and thus to interfere with the due administration of the criminal law, and such fact may be shown in contradiction of the testimony of the witness, drawn out by the state in cross examination.  It is said in Bradner on Evidence (page 20, chapter 2, section 18):  "It is not collateral, but relevant to the main issue, to inquire into the motives of a witness; and a party who examines him in regard to them is not bound by his answers, but may contradict them."  *State v. Patterson,* 2 Ired. 346; *Morgan v. Frees,* 15 Barb. 352; *Newcomb v. State,* 37 Miss. 383; *Atwood v. Welton,* 7 Conn. 66; *People v. Austin,* 1 Parker, Cr. R. 154.

IV.  Complaint is made of the refusal of the court to give certain instructions asked by the defendant, and of certain rulings made touching the admission of evidence, and of remarks made by the court in ruling upon an objection made.  These, and all other

questions raised, we have carefully examined. There was no error. The questions referred to are not so important as to demand detailed consideration. The motion to strike appellee's additional abstract is overruled. The judgment below is AFFIRMED.