STATE OF IOWA, Appellee, v. HENRY JOHNSON, Appellant.

**Criminal law:** MURDER: SELF DEFENSE: UNCOMMUNICATED THREATS.
1  A defendant charged with murder may show recent uncommunicated threats of decedent to take his life, in support of a plea of self-defense, where the same are so related in point of time as to show a continuous state of mind.

**Same:** EVIDENCE: IMPEACHMENT. A criminal defendant is not bound
2  by the statement of witnesses for the state on cross examination that they were not prejudiced; but he may show the bias of such witnesses by substantive proof, unless too remote and collateral to the inquiry.

**Same:** EVIDENCE: ADMISSIBILITY. Where defendant claimed that he

suspected decedent of having improper relations with his minor daughter, and that he was not seeking to do him personal violence but to satisfy himself on that point, evidence that shortly before the fatal affray a witness had told defendant that he had seen deceased in company with his daughter unattended and that he had given her a present was admissible.

**Instructions:** INCOMPLETENESS. Mere incompleteness of an instruction when standing alone, which is correct as far as it goes and the subject matter is fully covered by other instructions, is not ground for condemning it; unless so erroneous in itself or in such conflict with some of the others that both cannot stand as correct statements of the law.

**Same:** MURDER: PROVOCATION: INSTRUCTION. The instruction in this case that if defendant without provocation, that is without malice, shot decedent with intention of inflicting some serious bodily injury, but the act went beyond his intention and caused death, he was guilty of murder in the second degree was objectionable, as leading the jury to believe that if the killing was without provocation, though not intended, the accused was still guilty of murder in the second degree; as a killing under such circumstances, even if not excusable, is only presumptively malicious.

*Appeal from Freemont District Court.*—HON. THOMAS ARTHUR, Judge.

SATURDAY, DECEMBER 13, 1913.

DEFENDANT was indicted for the crime of murder. Upon trial he was convicted of murder in the second degree, and appeals.—*Reversed* and *Remanded.*

*A. V. Thornell,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for the State.

DEEMER, J.—Defendant is charged with having shot and killed one Henry Porter. The killing is said to have occurred in a public highway, a short distance from the town of Hamburg, in Freemont county, Iowa, on the 20th day of Decem-

ber, 1912. The shooting is admitted by the defendant, but he claims that what he did was in self-defense. The state contends that the killing was willful, wrongful, malicious, and premeditated, and that it grew out of Porter's relations with defendant's divorced wife, or with some of their children. Porter, it seems, had been paying attention to this divorced wife, and this, so the state claims, angered defendant, caused difficulty between him and Porter, and finally led to the shooting. Testimony was adduced to show that the day before the killing defendant stated to many people that he might have trouble with Porter, that he needed killing, and that he would have to kill him, and that he might kill him before night. He declared that Porter had had the divorced wife, with one of her daughters, out from the town of Hamburg to her home; and he started out on the road, so the state claims, to find them. He met Porter on the highway as he (Porter) was returning to town, and fired several shots at him, two of which took effect; one producing instant death. There were no eye-witnesses to the transaction. Defendant claimed that Porter had been paying attention to his daughter Pearl, a girl sixteen years of age, who lived with defendant's divorced wife, and that he feared their relations were improper, and on the night of the murder he was following the parties for the purpose of determining, if possible, what their relations were. He says that after watching the parties until they had reached his divorced wife's home, he had been unable to discover anything that would help him in any way to determine the relations between his daughter and the deceased, and was standing by the roadside when Porter passed him on the way back to Hamburg; that after Porter had passed some fifty yards he himself started back towards town, and that at a certain turn in the road he suddenly came upon the deceased, and the deceased ordered him to stop. His statement as to what there took place is as follows:

Just as I turned the corner he (deceased) hollered 'Halt.'

I said, 'I want to see you a minute.' . . . And just then I said, 'I want to see you a minute,' and just as I said that he commenced shooting. I thought I was shot, and I grabbed my gun and commenced shooting. I was struck twice, I thought. . . . I shot five times. He shot five times. We exchanged ten shots. He shot me twice before I could answer, and I kept shooting until I was empty and he had to. I couldn't say that I saw Porter fall. He disappeared, but I couldn't tell whether he fell or not.

The case was tried by the state upon the theory that, after the defendant had emptied his revolver in shooting at the deceased and had killed him, he took the revolver that was in the deceased's possession, fired one shot into the dead body and the other at the body, and threw the revolver down in front of the deceased, to leave the impression with any one who might find him that the shooting was done in self-defense; and the defendant claimed on the trial that he did the shooting in defense of his person, as is indicated in the quotation from his testimony above set out. This is a sufficient statement of the facts to an understanding of the questions presented.

I. Defendant offered to show that shortly prior to the homicide the deceased exhibited a revolver which he was carrying on his person, and that he then and there made threats against the defendant. These threats were not communicated to the defendant; but by one of the witnesses defendant offered to show that the exhibition of the revolver and the making of the threats occurred the day before the homicide. Other transactions of the like kind were more remote, but none longer than three weeks before the affray. All of the offers were refused, doubtless on the theory that because uncommunicated they were inadmissible. No other ground appears for the ruling, and none other is suggested by counsel for the state, save that it is claimed the transactions were too remote. The first ruling made on an offer of this kind might possibly be sustained on the theory that it was too

1. CRIMINAL LAW: murder: self-defense: uncommunicated threats.

remote; but the last, of course, has no such basis. This last offer was of a threat the day before the killing, and the intermediate one. was of a threat not ,so remote as the first one which defendant offered to show, and yet not so recent as the last one. But, in view of the frequency· of the threats, it seems to us all were admissible; for they were so related as to show a continuous state of mind; and, if one was admissible, all were. Where a defendant relies upon self-defense, as in this case, it is the rule of this court that recent uncommunicated threats, made by the deceased against the defendant, are admissible in evidence. *State v. Elliott,* 45 Iowa, 486; *State v. Helm,* 92 Iowa, 540; *State v. Beird,* 118 Iowa, 474; *State v. Butler,* 146 Iowa, 285.

II.    Defendant offered to show the bias and prejudice of certain witnesses called by the state. These matters were called to the attention of the state's witnesses on cross-examination, and they denied them. When defendant came to offer his testimony, he produced the witnesses to whom the state's witnesses had made declarations showing this bias, prejudice, and interest in the case; but the trial court would not permit their testimony to be introduced. In this there was error. One is not bound by the statement of a witness on cross-examination that he is not biased or prejudiced. This is not a collateral matter, but one which the party against whom the witness testifies may always show as a matter of substantive proof, unless so remote and collateral to the inquiry that it does not convict the witness of bias. Such is the almost universal voice of authority. Jones on Evidence (2d Ed.) Sections 828, 829; *State v. McKinstry,* 100 Iowa, 82; *People v. Brooks,* 131 N. Y. 321 (30 N. E. 189); *Geary v. People,* 22 Mich. 220; Wharton's Crim. Evidence (9th Ed.) Sections 482-485. *State v. Townsend,* 66 Iowa, 741, relied upon by the state, when properly analyzed, does not run counter to this rule.

2. SAME: evidence: impeachment.

III.    The defendant's counsel made an offer to show the

following, by a witness called by him: "At this time the defendant offers to prove by the witness James Bogan that

**3. SAME: evidence: admissibility.**

a short time before the killing of Henry Porter, James Bogan told Henry Johnson, that he had seen Porter walking up town with Pearl Johnson, and he had seen him give her a scarf pin, and that he had seen Pearl Johnson and Henry Porter alone together, unattended by any other person." In view of defendant's claim that he suspected deceased was having improper relations with his daughter Pearl, and that he went out on the day of the killing to try and satisfy himself on this point, and not for the purpose of waylaying or assaulting the deceased, we think this testimony should have been received. The weight of such testimony was for the jury, but the defendant was entitled to have it go before that body for what it was worth. That the state's counsel regarded such testimony as proper is evidenced from these excerpts taken from the argument of one of them:

He [defendant] wasn't going out there because he believed that this man, in the presence of the mother and in the presence of the two younger sisters, would hold improper relations with Pearl, but he was going out there because down in his heart there was a hatred of this man because he paid attentions to the divorced wife. . . . I think I am fair about the statement that there is no word of mouth in this case, nowhere from no witness, not even from Henry Johnson himself, who was upon the witness stand for a day and a half, nearly, of any man that ever saw Henry Porter paying any attention to the daughter Pearl. . . . Johnson didn't say he had ever seen this man with Pearl, because he knew it wasn't true, and he knew that if he told that which was untrue a dozen witnesses whom he had not time to remove from the jurisdiction of this court could come upon the stand and testify.

It was hardly fair, to say the least, for counsel to make such claim in argument after securing a ruling which prevented defendant from making the showing referred to. In

this connection we call attention to the following ruling made
on defendant's own testimony, while he was a witness upon
the stand:

Q. . . . You may state whether you had, prior to the
time, been told that Mr. Porter had been getting buggies there?

Mr. Eaton: This is objected to as incompetent and imma-
terial.

The Court: There isn't any material issue in this case
about him going to the livery barn. Excepted to.

Q. You may state whether you had been told that Mr.
Porter had been getting buggies at the livery barn, and had
been taking your daughter Pearl out? A. Yes, sir.

Mr. Eaton: That is objected to as incompetent, imma-
terial and irrelevant.

The Court: Sustained, and the answer may go out.

IV. Many of the instructions are challenged. Most of
the complaints are without merit, and some of them hyper-
critical. To set them out would answer to no purpose save to
extend an opinion beyond its proper length;
4. INSTRUC-
TIONS: incom-
pleteness.
hence we shall refer to but few of those which
are said to be erroneous. Standing alone,
several might be said to be incomplete, but as they were cor-
rect, in so far as they went, and as the matter was fully cov-
ered by subsequent or prior instructions, the mere incom-
pleteness of one is no ground for condemning it, unless it is
so erroneous in itself, or so in conflict with some of the others,
that both cannot stand as correct expositions of the law.

Tested by these rules there was no conflict, and the in-
structions taken as a whole fully covered the case. The only
doubt we have is of the correctness of the sixteenth instruc-
tion, which reads as follows:

In murder of the first degree, unless the act is done in the
perpetration or attempt to perpetrate arson, rape, robbery,
mayhem, or burglary, there must be a specific intention to kill,
in doing the act which causes death, and the killing must be
deliberate and premeditated, but these elements are not essen-

tial to murder of the second degree. If one person, without provocation—that is, with malice—shoot another with intention to inflict upon him some serious bodily harm, and the act goes beyond the intention, and causes the death of the person assailed, the one who fired the shot is guilty of murder in the ' second degree; and it would make no difference in this respect that at the time the act was done there was no intention to take the life of the deceased.

That part of the instruction which makes an act, done without provocation, malicious is of such doubtful propriety that it should not have been given. "Provocation" is not the equivalent of "excuse." Again, the instruc-

5. SAME: murder: provocation: instruction.

tion makes an act done without provocation, and beyond the purpose intended, malicious as a matter of law. Whereas, it may not have been unlawful, and perhaps excusable, because done in self-defense. Moreover, a jury was likely to find, from this instruction, that if the killing was without provocation, although not intended, it was, as a matter of law, murder in the second degree. Under our rule the most that could be claimed is that such a killing, if not excusable, is presumptively malicious. *State v. Cater,* 100 Iowa, 501; *State v. Dennis,* 119 Iowa, 688; *State v. Phillips,* 118 Iowa, 660; *State v. Brown,* 152 Iowa, 427. At any rate, the instruction is not clear, and it should be avoided on a retrial of the case.

For the errors pointed out, the judgment must be reversed, and the case remanded for a new trial.

*Reversed* and *Remanded.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concurring.